# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE:  LEAD CONTAMINATED FRUIT JUICE PRODUCTS MARKETING AND SALES PRACTICES LITIGATION _____ THIS FILING RELATES TO: | MDL NO. 2231 |

| | |
|---|---|
| SUZANNE KENNEDY, KAREN POULIS, JASMINE BEAN-WALTON and ARLENE PATRICK on behalf of themselves and all others similarly situated,      Plaintiff, v. THE COCA-COLA COMPANY, GERBER PRODUCTS COMPANY,  and MOTT'S LLP,      Defendants. | Civil Action No. 3:11-cv-30108-MAP |

## SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Plaintiffs Suzanne Kennedy, Karen Poulis, Jasmine Bean-Walton and Arlene Patrick ("Plaintiffs"), by their attorneys, bring this action both on their own behalf and on behalf of a class (the "Class") comprised of themselves and all others similarly situated, pursuant to Rule 23 of the Federal Rules of Civil Procedure ("F.R.C.P."), against Defendants The Coca-Cola Company, Gerber Products Company and Mott's, LLP (collectively, "Defendants" unless otherwise indicated), and allege the following upon information and belief, except as to paragraphs pertaining to Plaintiffs' own actions, which are alleged upon personal knowledge:

## I.    <u>INTRODUCTION</u>

1.      Plaintiffs bring this action both on their own behalves and on behalf of the Class comprised of all others similarly situated to redress Defendants' numerous unfair and deceptive acts and practices designed to mislead the public into believing certain of their fruit juice and other fruit-based products are safe and healthy for consumers, specifically children, when, in fact, they contain the known toxic chemical lead, which is associated with a variety of health risks and which is particularly harmful to children who are more susceptible to chemical toxicity than adults.

2.      Specifically, this is a proposed class action brought on behalf of all consumers who purchased Defendants' fruit juice and other fruit-based products reported to contain lead, including Minute Maid® Juice Apple – 100% Apple Juice, Mott's 100% Apple Juice, Gerber Organic 100% Juice – Apple Juice, Gerber 100% Juice Apple Juice, Gerber 3d Foods® NatureSelect™ Pears, Gerber 3rd Foods® NatureSelect™ Peaches, Gerber 3d Foods Pears and Gerber 3d Foods Peaches (collectively, the "Contaminated Products") and seeks redress for Defendants' deceptive practices in misrepresenting and/or omitting the true nature of these products in order to market them for consumption by children and others, all in violation of law.

3.      In this regard, on June 9, 2010, Defendants were notified by the Environmental Law Foundation, a California non-profit organization, that the Contaminated Products, as well as other products, violated California's Safe Drinking Water and Toxic Enforcement Act of 1986, California Health and Safety Code sections 25249, *et seq.* ("Proposition 65") because they contained excessive levels of lead without any warnings or disclosures.

4.      The notice alleged that the toxic chemical lead was found in a variety of children's and baby foods manufactured and sold by Defendants and others in violation of

Proposition 65's provision that "No person in the course of doing business shall knowingly and intentionally expose any individual to a chemical known to the state to cause cancer or reproductive toxicity without first giving clear and reasonable warning to such individual. . ."

5.      The notice identified 125 specific products containing lead in amounts greater than the permissible daily intake level set forth by Proposition 65 of 0.5 micrograms per day in the following food categories: apple juice, grape juice, packaged pears and peaches (including baby food), and fruit cocktail.

6.      In addition to violating Proposition 65, Defendants have violated numerous other laws, as set forth in detail below.

## II.     PARTIES

7.      Plaintiff Suzanne Kennedy is a resident of Aspen, Colorado.  On personal knowledge, Plaintiff Kennedy purchased Contaminated Products for herself and her family, particularly her children, regularly between November 2009 and July 2010.  Specifically, Plaintiff Kennedy purchased Minute Maid® Juice Apple – 100% Apple Juice, Motts 100% Apple Juice, Gerber 100% Juice Apple Juice, Gerber 3d Foods Pears and Gerber 3d Foods Peaches from various stores, including Target, City Market and Clark's Market in Aspen, Colorado.

8.       Plaintiff Karen Poulis is a resident of Boca Raton, Florida.  On personal knowledge, Plaintiff Poulis purchased Contaminated Products for herself and her family, particularly her children, regularly during the Class Period.  Specifically, Plaintiff Poulis purchased Gerber 100% Juice Apple Juice from various stores, including Publix GreenWise Market in Boca Raton, Florida.

9.     Plaintiff Jasmine Bean-Walton is a resident of San Diego, California.  On personal knowledge, Plaintiff Bean-Walton purchased Contaminated Products for herself and her family, particularly her children, regularly during the Class Period.  Specifically, from grocery stores, including Von's grocery store in San Diego, California, Plaintiff Bean-Walton purchased Gerber 100% Juice Organic – Apple Juice over twenty times between June 2010 and October 2010 and Gerber 3rd Foods® NatureSelect[TM] Pears and 3rd Foods® NatureSelect[TM] Peaches eight times between July 2010 and October 2010.

10.     Plaintiff Arlene Patrick is a resident of Solano County, California.  On personal knowledge, Plaintiff Patrick purchased Contaminated Products for herself and her family, particularly her children, regularly during the Class Period.  Specifically, between July 2010 and October 2010, Plaintiff Patrick purchased Gerber's 100% Juice Organic – Apple Juice over twenty times,  Gerber's 3rd Foods® NatureSelect[TM] Pears eight times, and  Gerber's 3rd Foods® NatureSelect[TM] Peaches eight to ten times from grocery stores, including Albertson's grocery store in Vallejo, California.

11.     The Coca-Cola Company ("Coca-Cola") is organized and existing under the laws of the State of Delaware with its principal place of business located at One Coca Cola Plaza, Atlanta, Georgia 30313.  For the purposes of diversity jurisdiction, Coca-Cola may be considered a "citizen" of either Delaware or Georgia.  At all times relevant hereto, Coca-Cola was and is doing business within Colorado either directly or indirectly through the sale of its products in Colorado.  Minute Maid® 100% Juice Apple Juice is among Coca-Cola's products and is marketed for consumption by children.

12.     Gerber Products Company ("Gerber") is organized and existing under the laws of the State of Michigan with its principal place of business located at 12 Vreeland Road, Florham

Park, New Jersey 07932.  For the purposes of diversity jurisdiction, Gerber may be considered a "citizen" of either Michigan or New Jersey.  Gerber® NatureSelect™ 3rd Foods® Fruits – Peaches, Gerber® NatureSelect™ 3rd Foods® Fruits – Pears, Gerber 3d Foods Pears, Gerber 3d Foods Peaches, Gerber® 100% Fruit Juices – Apple Juice, and Gerber's 100% Juice Organic – Apple Juice  are among Gerber's products. Gerber® NatureSelect™ products are marketed for consumption by children.

13.     Mott's, LLP ("Mott's") is organized and existing under the laws of the State of Delaware with its principal place of business located at 900 King Street, Rye Brook, New York 10573.  For the purposes of diversity jurisdiction, Mott's may be considered a "citizen" of either Delaware or New York.  At all times relevant hereto, Mott's was and is doing business within Colorado either directly or indirectly through the sale of its products in Colorado.  Mott's 100% Apple Juice is among Mott's products and is marketed for consumption bychildren.

14.     At all times herein mentioned, the employees of each Defendant, its subsidiaries, affiliates and other related entities, were the agents, servants and employees of that Defendant, and at all times herein mentioned, each was acting within the purpose and scope of said agency and employment.  Whenever reference in this Complaint is made to any act or transaction of any Defendant, such allegation shall be deemed to mean that the principals, officers, directors, employees, agents, and/or representatives of that Defendant committed, knew of, performed, authorized, ratified and/or directed such act or transaction on behalf of that Defendant while actively engaged in the scope of their duties.

III.   **JURISDICTION AND VENUE**

15.   This Court has jurisdiction over this class action under 18 U.S.C. §1332(d), which, under the provisions of the Class Action Fairness Act ("CAFA"), explicitly provides for the original jurisdiction of the Federal Courts of any class action in which any member of the class is a citizen of a State different from any Defendant, and in which the matter in controversy exceeds in the aggregate the sum of $5,000,000, exclusive of interest and costs.  Plaintiffs allege that the total claims of individual class members against each Defendant in this action are well in excess of $5,000,000 in the aggregate, exclusive of interest and costs, as required by 28 U.S.C. § 1332(d)(2) and (5).  Plaintiffs allege that members of the proposed classes are comprised of individuals from all 50 States and that numerous members of each proposed class are citizens of States different from the State in which each Defendant is a citizen.  Furthermore, Plaintiffs allege that more than two-thirds of all of the members of each proposed class in the aggregate are citizens of a State other than Colorado, where this action was originally filed, and that the total number of members of each proposed class is greater than 100, pursuant to 28 U.S.C. § 1332(d)(5)(B).  Therefore, diversity of citizenship exists under CAFA as required by 28 U.S.C. § 1332(d)(2)(A).

16.   Venue in the District of Colorado is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action occurred in Colorado and/or Defendants can be found in Colorado.

IV.   **FACTUAL ALLEGATIONS**

A.   **Children Are More Susceptible To Chemical Toxicity Than Are Adults**

17.   The fact that children are more susceptible to chemical toxicity than adults is widely recognized.

18.     The National Academy of Sciences ("NAS") published a report in 1993 entitled

"Pesticides in the Diets of Infants and Children" ("NAS Report").  NAS explained that children

are not little adults with respect to potential chemical toxicities:

> A fundamental maxim of pediatric medicine is that children are not "little adults."
> Profound differences exist between children and adults.  Infants and children are
> growing and developing.  Their metabolic rates are more rapid than those of
> adults.  There are differences in their ability to activate, detoxify, and excrete
> xenobiotic compounds.  All these differences can affect the toxicity of pesticides
> in infants and children, and for these reasons the toxicity of pesticides is
> frequently different in children and adults.

NAS Report, at 3-4.

19.     The Natural Resources Defense Council ("NRDC") issued a report in 1997

entitled "Our Children At Risk; The 5 Worst Environmental Threats To Their Health" (the

NRDC Report."  The NRDC explained that children are relatively more susceptible to potential

chemical toxicities:

> Pound for pound, children breathe more air, drink more water, and consumer
> more food than adults.  This higher rate of intake means that children will receive
> higher doses of whatever contaminants are present in the air, water, or food.  In
> addition, infants have a relatively greater surface area of skin than adults, thereby
> increasing their potential dermal absorption of certain compounds. . . .  A typical
> newborn weighs one-twentieth of the weight of an adult male, but the infant's
> surface area is one-eighth as great.  Therefore, the total area of skin that could be
> exposed to a chemical. . .is two and a half times as great per unit of body weight
> in the infant as in the adult.

NRDC Report, Ch. 2 (citing International Programme on Chemical Safety, Principles for

Evaluating Health Risks From Chemicals During Infancy and Early Childhood:  The

Need for a Special Approach, Environmental Health Criteria 59, World Health

Organization, 1986).

20.     The United States Environmental Protection Agency ("EPA") issued its

"Supplemental Guidance for Assessing Susceptibility from Early-Life Exposure to

Carcinogens," (the "EPA Supplemental Guidance") in early 2005.  The EPA recognized that toxicokinetic and toxicodynamic differences between children and adults are greatest during the first two years of life.  EPA Supplemental Guidance, at 32 (citations omitted).

21.     Later in 2005, the Intergovernmental Forum on Chemical Safety's (the "IFCS") Children and Chemical Safety Working Group published a report titled "Chemical Safety and Children's Health; Protecting the world's children from harmful chemical exposures:  a global guide to resources" ("2005 IFCS Report").  The IFCS concluded that children are uniquely prone to harmful chemical exposures and their adverse health effects because:

  a.    Children's exposure begins at conception, as chemicals in a pregnant woman's body cross the placenta and affect the embryo or fetus during critical periods of development.  Some chemicals also accumulate in breast milk, compromising (though not negating) the benefits of this important food for infants.

  b.    Even after birth, children's bodies remain immature, with underdeveloped detoxification mechanisms to protect them from chemicals.  Their brains and other organ systems are constantly developing, undergoing periods of particular sensitivity to damage or disruption.

  c.    Compared with adults, children breathe faster and eat and drink more in proportion to their bodyweight, resulting in greater exposure to chemicals in air, food, and water.

  d.    Children spend more time outdoors, and often play on the ground or the floor, where chemicals such as pesticides and heavy metals are present.  In addition, young children frequently place their hands or other objects in their mouths, making ingestion of chemicals more likely.  Pregnant women and young children are often at higher risk of inhaling or coming into contact with chemicals used indoors, such as cleaning solutions, paints, cosmetics, and other household and consumer products.

  e.    Children are less aware of potential chemical risks around them, and are therefore less likely to avoid harmful exposures.

2005 IFCS Report, at 3 (emphasis in original) (footnote omitted).

22.     Based on this empirical data and the fact that Defendants' conduct is directed at children who are more susceptible to chemical exposures, Defendants needed to be particularly vigilant to ensure that their food products did not contain harmful chemicals that might have both short and long term health effects, even at potentially very small exposure levels.

**B.     The Contaminated Products are Hazardous to Children's Health**

23.     The Contaminated Products reportedly contain the known hazardous chemical lead.  Lead is widely recognized to be toxic, particularly when ingested by children.

24.     For example, the substance profile for lead and lead compounds prepared by the National Toxicology Program ("NTP") states, in part:

   a.     Lead and lead compounds are ***reasonably anticipated to be human carcinogens*** based on limited evidence from studies in humans and sufficient evidence from studies in experimental animals.  Lead exposure has been associated with increased risk of lung, stomach, and bladder cancer in diverse human populations (Fu and Boffetta 1995, Steenland and Boffetta 2000, NTP 2003).

   b.     Absorption of lead is affected by age, the chemical form of the lead, and minerals in the diet (e.g., iron, calcium, and zinc) (ATSDR 1999).  Gastrointestinal absorption of lead is greater in children than in adults (Hammad *et al.* 1996) (emphasis added).   Once absorbed, lead is distributed to blood plasma, the nervous system, and soft tissues.   It subsequently is redistributed and accumulates in bone; approximately 75% to 90% of the lead body burden is found in bones and teeth.

   c.     Lead concentrations in U. S. drinking water generally are below 5 μg/L. Lead also is found in food, cigarette smoke, and alcoholic beverages. Levels in food have declined since the elimination of lead-soldered food cans between 1979 and 1989 (ATSDR 1999).  In 1990, the estimated daily intake of lead from consumption of food, water, and beverages was approximately 4 μg for children 2 years of age and younger, 6 to 9 μg for children aged 14 to 16, 6 to 9 μg for adults aged 25 to 30, and 2 to 8 μg for adults aged 60 to 65.  For young children, the most common source of environmental lead exposure is direct ingestion of paint chips and lead-laden dusts and soils released from aging painted surfaces.  These sources can contribute an additional daily intake of 5 μg for a toddler engaging in normal hand-to-mouth activity (CDC 1997, Lanphear *et al.* 1998).

25.     A monograph prepared by the International Agency for Research on Cancer ("IARC") regarding lead states, in part:

a.     A considerable body of evidence suggests that children are more sensitive than adults to the neurotoxic properties of lead.   Although clinical symptoms of toxicity generally become apparent at blood lead concentrations of 70 μg/dL, many important disturbance occur at much lower concentrations.   These include electrophysiological anomalies of evoked brain potential in response to auditory stimuli and reduced peripheral nerve conduction.   Both cross-sectional and prospective studies of children have found impairments in cognition, attention, and language function at concentrations of lead previously thought to be harmless.

b.     In studies with larger samples, better measures of lead burden and neuro-behavioural function, and more advanced statistical techniques, effects are detectable at blood lead concentrations below 10 μg/dL.   The relative effect is greater below 10 μg/dL than above this level. Recently, attention has shifted from the impact of lead on cognition to its effects on behaviour. Exposure to lead has been found to be associated with attentional dysfunction, aggression and delinquency.

c.     Exposure to lead is associated with cardiovascular effects and with changes in endocrine and immune functions.

d.     Many of the effects of lead exposure in humans have been confirmed in experimental systems.   At the cellular level, lead has mitogenic properties; it affects various regulatory proteins, including those that depend on the presence of zinc.

e.     Inorganic lead compounds are *probably carcinogenic to humans (Group 2A).*   Organic lead compounds are *not classifiable as to their carcinogenicity to humans (Group 3).*

f.     Organic lead compounds are metabolized, at least in part, to ionic lead both in humans and animals.  To the extent that ionic lead, generated from organic lead, is present in the body, it will be expected to exert the toxicities associated with inorganic lead.

IARC Monographs Volume 87, pp. 375 - 378.

26.     The Agency for Toxic Substances and Disease Registry ("ATSDR") published a case study in environmental medicine (the "CSEM") concerning lead toxicity on August 20, 2007.  The CSEM's environmental alert states:

a.   Children of all races and ethnic origins are at risk of lead toxicity throughout the U. S.

b.   Lead may cause irreversible neurological damage, as well as renal disease, cardiovascular effects, and reproductive toxicity.

c.   Blood lead levels once considered safe are now considered hazardous, with no known threshold.

d.   Lead poisoning is a wholly preventable disease.

CSEM, p.1.

27.   The CSEM also states that lead exposure in the general population (including children) occurs primarily through ingestion (*id.*, p.16) and further explains:

a.   Because of their behavior and physiology, children are more affected by exposure to lead than are adults.

b.   Children absorb more ingested lead than do adults.

c.   In addition, the percent of lead absorbed in the gut, especially in an empty stomach, is estimated to be as much as five to 10 times greater in infants and young children than in adults.  (Alexander *et al.* 1974; Chamberlain *et al.* 1978; James *et al.* 1985; Ziegler *et al.* 1978 as cited in ATSDR 1999).

d.   Gastrointestinal absorption of lead in children is increased by iron, calcium, zinc, and ascorbate deficiency.  (Mahaffey *et al.* 1990 as cited in AAP 1993).

e.   Children are more sensitive than adults are to elevated blood lead levels ("BLLs").  Children's developing brains and nervous system (and other organ systems) are very sensitive to lead.

f.   Childhood lead exposure has been associated with:

(i)   higher absenteeism in high school;

(ii)   lower class rank;

(iii)   poorer vocabulary and grammatical reasoning scores;

(iv)   longer reaction time;

(v)   poorer hand-eye coordination (AAP, 1993);

(vi)     The incomplete development of the blood-brain barrier in fetuses and in very young children (up to 36 months of age) increases the risk of lead's entry into the developing nervous system, which can result in prolonged or permanent neurobehavioral disorders;

(vii)    Children's renal, endocrine, and hematological systems may also be adversely affected by lead exposure.

g.     There is no known threshold exposure level (as indicated by BLLs) for many of these effects.  No blood lead threshold for adverse health effects has been identifie[d] in children.

h.     Children suffer neurological effects at much lower exposure levels.

(i)     Neurological effects may begin at low (and, relatively speaking, more widespread) BLLs, at or below 10 μg/dL in some cases, and it may not be possible to detect them on clinical examination.

(ii)    Some studies have found, for example, that for every 10 μg/dL increase in BLL, children's IQ was found to be lower by four to seven points. (Yule *et al.,* 1981; Schroeder *et al.,* 1985; Fulton *et al.,* 1987; Landsdown *et al.*, 1986; Hawk *et al.*, 1986; Winneke *et al.*, 1990 as cited in AAP 1993).

(iii)    There is a large body of evidence that associates decrement in IQ performance and other neuropsychological defects with lead exposure.

(iv)    There is also evidence that attention deficit hyperactivity disorder (ADHD) and hearing impairment in children increase with increasing BLLs, and that lead exposure may disrupt balance and impair peripheral nerve function. (ATSDR 2005).

(v)     Some of the neurological effects of lead in children may persist into adulthood.

*Id*. at pp. 18 – 31 (emphasis added).

28.     Several States have specifically recognized the dangers posed by lead.  For example, in California, lead was placed in the Governor's list of chemicals known to the State of

California to cause reproductive toxicity on February 27, 1987.  It is specifically identified under three subcategories:   "developmental reproductive toxicity," which means harm to the developing fetus, "female reproductive toxicity," which means harm to the female reproductive system, and "male reproductive toxicity," which means harm to the male reproductive system. (Cal. Code Regs., tit. 22, §12000, subd. (c))   "Lead and lead compounds" was placed in the Governor's list of chemicals known to the State of California to cause cancer on October 1, 1992.  (Cal. Code Regs., tit. 22, §12000, subd. (b)).

29.     The Colorado Department of Public Health and Environment conducted a survey of blood lead levels among children during 1995 and published its Final Report entitled "Denver Childhood Blood Lead Survey" in January, 1996 in which the Department recognized potential adverse health effects to children associated with exposure to lead, including:

   a.     Lead is a poison that affects virtually every system in the body."

   b.     "It is particularly harmful to the developing brain and nervous
          system of fetuses and young children."

   c.     "Lower levels cause adverse effects on the central nervous system,
          kidney, and hematopoietic system."

   d.     "Blood lead levels as low as 10 μg/dL, which do not cause
          distinctive symptoms, are associated with decreased intelligence
          and impaired neurobehavioral development."

   e.     "Many other effects begin at these low blood lead levels, including
          decreased stature or growth, decreased hearing acuity, and
          decreased ability to maintain a steady posture."

30.     New Jersey's Department of Health and Senior Services has published a Right to Know Hazardous Substance Fact Sheet that states in part:

   a.     Lead can affect you when inhaled or swallowed.

   b.     Lead is a CARCINOGEN and may be a TERATOGEN[…].

    c.       Lead may damage the nervous system.

    d.       Exposure may cause kidney and brain damage, and anemia.

    e.       Lead is a PROBABLE CARCINOGEN in humans and may be a TERATOGEN in humans.  There may be <u>no</u> safe level of exposure to a carcinogen, so all contact should be reduced to the lowest possible level.

    f.       Lead is a PROBABLE CARCINOGEN in humans.  There is some evidence that Lead and Lead compounds cause lung, stomach, brain and kidney cancers in humans and they have been shown to cause kidney cancer in animals.

    g.       Many scientists believe there is no safe level of exposure to a carcinogen.

31.    New York, Connecticut, and Georgia, among other States, also recognize that lead is hazardous.

**C.**    <u>**Defendants Either Knew or Reasonably Should Have Known the Food Products were Defective and Potentially Unsafe for Children**</u>

32.    At all relevant times, Defendants were in a superior position relative to consumers to know, or reasonably should have known, that certain of their food products contained lead in amounts that could harm children.

33.    Defendants go to great lengths to promote the quality and safety of their products, yet none of Defendants' promotional materials or labels disclosed the fact that the Contaminated Products contained the known toxic chemical lead or provided any warning concerning the potential adverse health effects associated with ingestion of lead.

**D.**    <u>**Defendants' Actionable Practices**</u>

34.    Defendants manufactured, designed, advertised, marketed, packaged, labeled, distributed and sold the Contaminated Products as safe for consumption, particularly by children.

35.     However, Defendants did not disclose, or warn of, the presence of the known toxic chemical lead in the Contaminated Products, which is particularly harmful to children who are more susceptible to chemical toxicity than adults.

36.     As a result of Defendants' deceptive acts and practices, Plaintiffs were misled into purchasing the Contaminated Products, thereby resulting in her suffering injury in fact and a loss of money or property resulting from Defendants' conduct.   Had warnings and/or disclosures concerning the levels of lead in the Contaminated Products been made by Defendants, which were not, Plaintiffs would not have purchased any of the Contaminated Products and exposed themselves, and especially their children, to the known toxic chemical lead, which is particularly harmful to children who are more susceptible to chemical toxicity than adults.

## V.     CLASS ALLEGATIONS

37.     Pursuant to F.R.C.P. 23, Plaintiffs bring this action on behalf of themselves and a Class comprised of themselves and other consumers who purchased the Contaminated Products in the United States during the relevant time period.   Defendants' practices and omissions were applied uniformly to all members of the Class, so that the questions of law and fact are common to all members of the Class.   All putative Class members were and are similarly affected by having purchased the Contaminated Products for their intended and foreseeable purpose as promoted, marketed, advertised, packaged and labeled by Defendants as set forth in detail above, and the relief sought herein is for the benefit of Plaintiffs and members of the putative Class. Plaintiffs allege that the Class is so numerous that joinder of all members would be impractical.

38.     Based on the annual sales of the Contaminated Products and the popularity of the Contaminated Products, it is apparent that the number of consumers of the Contaminated Products would at least be in the many thousands, thereby making joinder impossible.

39.     Questions of law and fact common to the Class exist and predominate over questions affecting only individual members, including, *inter alia*:

a.      Whether Defendants' practices in connection with the promoting, marketing, advertising, packaging, labeling and sale of the Contaminated Products were deceptive or unfair in any respect, thereby violating the consumer protection statutes of the various States;

b.      Whether Defendants breached implied warranties in their sale of the Contaminated Products, thereby causing harm to Plaintiffs and other Class members;

c.      Whether Defendants' practices in connection with the promotion, marketing, advertising, packaging, labeling and sale of the Contaminated Products unjustly enriched Defendants at the expense of, and to the detriment of, Plaintiffs and other Class members; and

d.      Whether Defendants' conduct as set forth above injured consumers and if so, the extent of the injury.

40.     The claims asserted by Plaintiffs in this action are typical of the claims of other Class members as the claims arise from the same course of conduct by Defendants, and the relief sought is common.

41.     Plaintiffs will fairly and adequately represent and protect the interests of the Class members.   Plaintiffs have retained counsel competent and experienced in both consumer protection and class action litigation.

42.     Certification of this class action is appropriate under F.R.C.P. 23(b) because the questions of law or fact common to the respective Class members predominate over questions of law or fact affecting only individual members.   This predominance makes class litigation superior to any other method available for the fair and efficient adjudication of these claims. Absent a class action remedy, it would be highly unlikely that the representative Plaintiffs or any other Class member would be able to protect their own interests because the cost of litigation through individual lawsuits might exceed expected recovery.   Certification is also appropriate

because Defendants acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole.  Further, given the large number of consumers of the Contaminated Products, allowing individual actions to proceed in lieu of a class action would run the risk of yielding inconsistent and conflicting adjudications.

43.     A class action is a fair and appropriate method for the adjudication of the controversy, in that it will permit a large number of claims to be resolved in a single forum simultaneously, efficiently, and without the unnecessary hardship that would result from the prosecution of numerous individual actions and the duplication of discovery, effort, expense and burden on the courts that such individual actions would engender.  The benefits of proceeding as a class action, including providing a method for obtaining redress for claims that would not be practical to pursue individually, outweigh any difficulties that might be argued with regard to the management of this class action.

## VI.   CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**(Violation of New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1, *et seq.*)**
(All Plaintiffs against Defendant Gerber)

44.     Plaintiffs repeat and reallege all preceding paragraphs, as if fully set forth herein.

45.     Plaintiffs bring this claim on behalf of themselves and all other persons who purchased Contaminated Products produced by Defendant and marketed nationwide, asserting claims under the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1, *et seq.* (the "NJCFA").

46.     At all relevant times, Defendant was and is a "person," as defined by N.J.S.A. 56:8-1(d).

47.     At all relevant times, the Contaminated Products constituted "merchandise," as defined by N.J.S.A. 56:8-1(c).

48.     At all relevant times, Defendant's manufacturing, marketing, advertising, sales and/or distribution of the Contaminated Products met the definition of "advertisement" set forth by N.J.S.A. 56:8-1(a).

49.     At all relevant times, Defendant's manufacturing, marketing, advertising, sales and/or distribution of the Contaminated Products met the definition of "sale" set forth by N.J.S.A. 56:8-1(e).

50.     N.J.S.A. 56:8-2 provides that "[t]he act, use or employment by any person of any unconscionable practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of material fact with the intent that others rely upon such concealment, suppression or omission, . . . is declared to be an unlawful practice. . .

51.     Defendant uniformly represented to Plaintiffs and other members of the Class, by means of its advertising, marketing and other promotional materials, and on the packaging and labeling of the Contaminated Products, that the Contaminated Products are safe and healthy for consumers, specifically children, but failed to disclose that, in fact, they contain the known toxic chemical lead, which is associated with a variety of health risks, as set forth in detail above, and is particularly harmful to children, who are more susceptible to chemical toxicity than adults.

52.     Defendant has therefore engaged in practices which are unconscionable, deceptive and fraudulent and which are based on false pretenses, false promises, misrepresentations, and the knowing concealment, suppression, or omission of material fact with the intent that others rely upon such concealment, suppression or omission in their manufacturing, advertising, marketing, selling and distribution of its Contaminated Products. Defendant has therefore violated the NJCFA.

53.     As a direct and proximate result of Defendant's improper conduct, Plaintiffs and the other members of the Class have suffered damages and ascertainable losses of moneys and/or property, by paying more for the Contaminated Products than they would have, and/or by purchasing Contaminated Products which they would not have purchased, if the benefits of taking such products had not been misrepresented, in amounts to be determined at trial.

54.     New Jersey has numerous contacts with the conduct alleged herein and a strong interest in applying the NJCFA to that conduct.  Defendant is found, does business or transacts business within New Jersey.  Defendant maintains its principal offices, as well as agents, in New Jersey and is licensed to do, has done, and continues to do business in New Jersey.  Defendant's advertising, marketing, pricing, sales and distribution operations for its Contaminated Products sold throughout the United States, which form the basis of this litigation, originate from and/or are controlled by, Defendant's offices in New Jersey.  In addition, Defendant directly advertised, marketed and sold its Contaminated Products to consumers in New Jersey.  As such, New Jersey's interest in applying the NJCFA to Defendant in this litigation outweighs any interests other States or their laws may have.

55.     A copy of the original complaint filed in this action will be mailed to the Attorney General of the State of New Jersey within 10 days of filing pursuant to N.J.S.A. 56:8-20.

## SECOND CAUSE OF ACTION
### (Violation of State Consumer Protection Laws)
(Plaintiff Kennedy against all Defendants; All Plaintiffs against Gerber)

56.     Plaintiffs incorporate by reference the preceding paragraphs as if they were fully set forth herein.

57.     In addition to and/or in the alternative to the foregoing cause of action, Plaintiffs bring this cause of action on their own behalf under the law of the State in which they purchased Contaminated Products produced by Defendants and on behalf of:  (a) all other persons who

purchased Contaminated Products produced by Defendants in the States where Plaintiffs purchased Contaminated Products; and (b) all other persons who purchased Contaminated Products in States having similar consumer protection laws.

58.     Each Plaintiff and member of the Class is a consumer, purchaser or other person entitled to the protection of the consumer protection laws of the State in which he or she purchased the Contaminated Products produced by Defendants.

59.     The consumer protection laws of the State in which each Plaintiff and member of the Class purchased the Contaminated Products declares that unfair or deceptive acts or practices in the conduct of trade or commerce are unlawful.

60.     Forty States and the District of Columbia have enacted statutes designed to protect consumers against unfair, deceptive, fraudulent and unconscionable trade and business practices and false advertising and that allow consumers to bring private and/or class actions. These statutes are found at:

a.     Alabama Deceptive Trade Practices Act, Ala. Code § 8-19-1, *et seq.*;

b.     Alaska Unfair Trade Practices and Consumer Protection Act, Ak. Code § 45.50.471, *et seq.*;

c.     Arkansas Deceptive Trade Practices Act, Ark. Code §4-88-101, *et seq.*;

d.     California Consumer Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.*, and California's Unfair Competition Law, Cal. Bus. & Prof Code § 17200, *et seq.*;

e.     Colorado Consumer Protection Act, Colo. Rev. Stat. § 6-1-101, *et seq.*;

f.     Connecticut Unfair Trade Practices Act, Conn. Gen. Stat § 42-110a, *et seq.*;

g.     Delaware Deceptive Trade Practices Act, 6 Del. Code § 2511, *et seq.*;

h.     District of Columbia Consumer Protection Procedures Act, D.C. Code §§ 28 3901, *et seq.*;

i.     Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. Ann. § 501.201, *et seq.*;

j.     Georgia Fair Business Practices Act, §10-1-390 *et seq.*;

k.      Hawaii Unfair and Deceptive Practices Act, Hawaii Revised Statues § 480 1, et. seq., and Hawaii Uniform Deceptive Trade Practices Act, Hawaii Revised Statutes §481A-1, *et seq.*;

l.      Idaho Consumer Protection Act, Idaho Code § 48-601, *et seq.*;

m.      Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS § 505/1, *et seq.*;

n.      Kansas Consumer Protection Act, Kan. Stat. Ann §§ 50 626, *et seq.*;

o.      Kentucky Consumer Protection Act, Ky. Rev. Stat. Ann. §§ 367.110, *et seq.*, and the Kentucky Unfair Trade Practices Act, Ky. Rev. Stat. Ann §§ 365.020, *et seq.*;

p.      Louisiana Unfair Trade Practices and Consumer Protection Law, La. Rev. Stat. Ann. §§ 51:1401, *et seq.*;

q.      Maine Unfair Trade Practices Act, 5 Me. Rev. Stat. § 205A, *et seq.*, and Maine Uniform Deceptive Trade Practices Act, Me. Rev. Stat. Ann. 10, § 1211, *et seq.*,

r.      Massachusetts Unfair and Deceptive Practices Act, Mass. Gen. Laws ch. 93A;

s.      Michigan Consumer Protection Act, §§ 445.901, *et seq.*;

t.      Minnesota Prevention of Consumer Fraud Act, Minn. Stat §§ 325F.68, *et seq.*; and Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.43, *et seq.*;

u.      Mississippi Consumer Protection Act, Miss. Code Ann. §§ 75-24-1, *et seq.*;

v.      Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et seq.*;

w.      Montana Unfair Trade Practices and Consumer Protection Act, Mont. Code §30-14-101, *et seq.*;

x.      Nebraska Consumer Protection Act, Neb. Rev. Stat. §59 1601, *et seq.*, and the Nebraska Uniform Deceptive Trade Practices Act, Neb. Rev. Stat. §87-301, *et seq.*;

y.      Nevada Trade Regulation and Practices Act, Nev. Rev. Stat. §§ 598.0903, *et seq.*;

z.      New Hampshire Consumer Protection Act,  N.H. Rev. Stat. § 358-A:1, *et seq.*;

aa.     New Jersey Consumer Fraud Act, N.J. Stat. Ann. §§  56:8 1, *et seq.*;

bb.     New Mexico Unfair Practices Act, N.M. Stat. Ann. §§ 57 12 1, *et seq.*;

cc.     New York Deceptive Acts and Practices Act, N.Y. Gen. Bus. Law §§ 349, *et seq.*;

dd.     North Dakota Consumer Fraud Act, N.D. Cent. Code §§ 51 15 01, *et seq.*;

ee. Ohio Rev. Code Ann. §§ 1345.02 and 1345.03; Ohio Admin. Code §§ 109:4-3-02, 109:4-3-03, and 109:4-3-10.

ff. Oklahoma Consumer Protection Act, Okla. Stat. 15 § 751, *et seq.*;

gg. Oregon Unfair Trade Practices Act, Ore. Rev. Stat § 646.608(e) & (g);

hh. Rhode Island Unfair Trade Practices And Consumer Protection Act, R.I. Gen. Laws § 6-13.1-1, *et seq.*;

ii. South Carolina Unfair Trade Practices Act, S.C. Code Laws § 39-5-10, *et seq.*;

jj. South Dakota's Deceptive Trade Practices and Consumer Protection Law, S.D. Codified Laws §§ 37 24 1, *et seq.*;

kk. Tennessee Consumer Protection Act, Tenn. Code Ann. § 47-18-101 *et seq.*;

ll. Vermont Consumer Fraud Act, Vt. Stat. Ann. tit.9, § 2451, *et seq.*;

mm. Washington Consumer Fraud Act, Wash. Rev. Code § 19.86.010, *et seq.*;

nn. West Virginia Consumer Credit and Protection Act, West Virginia Code § 46A-6-101, *et seq.*;

oo. Wisconsin Deceptive Trade Practices Act, Wis. Stat. §§ 100.18, *et seq.*

61. The Contaminated Products produced by Defendants constitute products to which these consumer protection laws apply.

62. In the conduct of trade or commerce regarding their production, marketing and sale of the Contaminated Products, Defendants engaged in one or more unfair or deceptive acts or practices, including but not limited to uniformly representing to Plaintiff and each Class Member by means of their advertising, marketing and other promotional materials, and on the packaging and labeling of the Contaminated Products, that the Contaminated Products are safe and healthy for consumers, specifically children, but failing to disclose that, in fact, they contain the known toxic chemical lead, which is associated with a variety of health risks, as set forth in detail above, and is particularly harmful to children, who are more susceptible to chemical toxicity than adults.

63.     Defendants' representations and omissions were false, untrue, misleading, deceptive and/or likely to deceive.

64.     Defendants knew or should have known that their representations and omissions were false, untrue, misleading, deceptive and/or likely to deceive.

65.     Defendants used or employed such deceptive and unlawful acts or practices with the intent that these Plaintiffs and members of the Class rely thereon.

66.     Plaintiffs and the other members of the Class did so rely.

67.     Each Plaintiff and member of the Class purchased Contaminated Products produced by Defendants who misrepresented the healthiness and safety of the Contaminated Products.  Plaintiffs and members of the Class would not have purchased the Contaminated Products but for the deceptive and unlawful acts of Defendants.

68.      As a result of Defendants' conduct, Plaintiffs and members of the Class were damaged.

69.     Defendants' conduct showed complete indifference to or conscious disregard for the rights and safety of others such that an award of punitive and/or statutory damages is appropriate.

**THIRD CAUSE OF ACTION**
**(Breach of Implied Warranties of Merchantability And Fitness for a Particular Purpose)**
(Plaintiff Kennedy against all Defendants; All Plaintiffs against Defendant Gerber)

70.     Plaintiffs incorporate by reference the preceding paragraphs as if they were fully set forth herein.

71.      In addition to the foregoing causes of action, each Plaintiff brings this cause of action on her own behalf under the law of the State in which she purchased Contaminated Products produced by Defendants and on behalf of:   (a) all other persons who purchased Contaminated Products produced by Defendants in the States where Plaintiffs purchased

Contaminated Products; and (b) all other persons who purchased Contaminated Products in States having similar laws regarding implied warranties of merchantability and fitness for a particular purpose.

72.     Plaintiffs and members of the Class purchased Contaminated Products produced by Defendants for the ordinary purposes of such products, with the understanding that it was, in fact, safe to consume them.  Plaintiffs and the members of the Class relied on Defendants' skill and judgment to select and furnish suitable goods for that purpose.

73.     Defendants held themselves out as possessing, and did, possess expertise, skill and knowledge superior to consumers including Plaintiffs and members of the Class, who had a right to rely thereon.

74.     By marketing the Contaminated Products for sale, Defendants impliedly warranted that such products were, in fact, safe for ordinary consumption by consumers, including children.

75.     By the acts set forth in detail above, Defendants warranted that the Contaminated Products are safe and healthy, but intentionally omitted, suppressed, and withheld material information regarding the presence of lead found in the Contaminated Products and the risks associated therewith.  Plaintiffs and the members of the Class bought the Contaminated Products relying on Defendants' skill, judgment and representations.   However, Defendants' Contaminated Products are not free from risk of harmful exposure to lead, as set forth in detail above.

76.     At the time of the sales, Defendants had reason to know the particular purpose for which the Contaminated Products were being offered and acquired and that Plaintiffs and other members of the Class were relying on Defendant's skill and judgment to select and furnish

suitable and safe goods for that purpose. Accordingly, there was an implied warranty that the Contaminated Products were fit for this purpose.

77.     However, Defendants breached this warranty implied at the time of sale by providing goods that are/were unsuitable for the purpose for which they were made and purchased because the Contaminated Products sold were not free from risk of harmful exposure to lead as discussed above.

78.     At all times material to this action, the Contaminated produced by Defendants were not, in fact, safe for consumption by consumers, particularly children.

79.     As such, the products produced and sold by Defendants were not fit for their ordinary or particular purposes.

80.     Defendants' conduct breached their implied warranties regarding Contaminated Products sold under state implied warranty laws including:

a.     Ala. Code § 7-2-314 and § 7-2-315.

b.     Alaska. St. § 45.02.314 and § 45.02.315.

c.     Ark. Code Ann. § 4-2-314 and § 4-2-315.

d.     Ariz. Rev. Stat. § 47-2314 and § 47-2315.

e.     Cal. Comm. Code § 2314.

f.     Co. Rev. Stat. § 4-2-314 and §4-2-315.

g.     Conn. Rev. Stat. § 42a-2-314 and 42a-3-315.

h.     6 Del. C. § 2-314 and § 2-315.

i.     D.C. Stat. § 28:2-314 and § 28:2-315.

j.     Fla. Stat. § 672.314 and § 672.315.

k.     Ga. Code Ann. § 11-2-314 and § 11-2-315.

l.     Haw. Rev. Stat. § 490:2-314 and § 490:2-315.

m.     Idaho Code Ann. § 28-2-314 and § 28-2-315.

n.     810 Ill. Comp. Stat. 5/2-314 and 5/2-315

o.     Ind. Code § 26-1-2-314 and § 26-1-2-315.

p.     Iowa Code § 554.2314 and § 554.2315.

q.      Kan. Ann. Stat. § 84-2-314 and 84-2-315.

r.      Ky. Rev. Stat. Ann. § 355.2-314 and § 355.2-315.

s.      La. Civ. Code Ann. Art. 2524.

t.      11 Maine Rev. Stat. Ann. § 2-314 and § 2-315.

u.      Md. Com. Law Code Ann. § 2-314 and § 2-315.

v.      Mass. Gen. Laws Ann. 106 § 2-314 and § 2-315.

w.      Mich. Comp. Laws Ann. 440.2314 and 440.2315.

x.      Minn. Stat. Ann. § 336.2-314 and §336.2-315.

y.      Miss. Code Ann. § 75-2-314 and § 75-2-315.

z.      Missouri Rev. Stat. §§ 400.2-314 and 400.2-315.

aa.     Mont. Code Ann. 30-2-314 and 30-2-315.

bb.     Neb. Rev. Stat. § 2-314 and § 2-315.

cc.     Nev. Rev. Stat. 104.2314 and 104.2315.

dd.     N.H. Stat. Ann. § 382-A:2-314 and § 382-A:2-315.

ee.     N.J. Stat. Ann. 12A:2-314 and 12A:2-315.

ff.     N.Y. CLR UCC § 2-314 and § 2-315.

gg.     N.M. Stat. Ann. § 55-2-314 and § 55-2-315.

hh.     N.C. Gen. Stat. § 25-2-314 and § 25-2-315.

ii.     N.D. Stat. 41-02-31 and 41-02-32.

jj.     Ohio Rev. Code Ann. § 1302.27 and § 1302.28.

kk.     Okla. Stat. Ann. tit. 12A, § 2-314 and § 2-315.

ll.     Ore. Rev. Stat. § 72.3140 and § 72.3150.

mm.     Pa. Stat. Ann. tit. 13, § 2314 and §2315.

nn.     R.I. Gen. Laws § 6A-2-314 and 6A-2-315.

oo.     S.C. § 36-2-314 and § 36-2-315.

pp.     S.D. Cod. Laws. § 57A-2-314 and § 57A-2-315.

qq.     Tenn. Code. Ann. § 47-2-314 and § 47-2-315.

rr.     Tex. Bus. & Com. Code Ann. § 2.314 and § 2.315.

ss.     Ut. Code Ann. § 70A-2-314 and § 70A-2-315.

tt.     9A Vt. Stat. Ann. § 2-314 and § 2-315.

uu.     Va. Code Ann. § 8.2-314 and § 8.2-315.

vv.     Wash. Rev. Code Ann. § 62A.2-314 and § 62A-3-315.

ww.     W. Va. Code § 46-2-314 and § 46-2-315.

xx.     Wis. Stat. Ann. § 401.314 and § 4-1.315.

yy.     Wyo. Stat. 34.1-2-314 and 34.1-2-315.

80.     These States do not require privity of contract in order to recover for breach of implied warranty under the circumstances alleged herein.

81.     As a result of Defendants' breach of their implied warranties, Plaintiffs and members of the Class have been damaged.

82.     Within a reasonable time after they knew or should have known of such breach, Plaintiffs, on behalf of themselves and members of the Class, placed Defendants on notice thereof.

## FOURTH CAUSE OF ACTION
### (Unjust Enrichment)
(Plaintiff Kennedy against all Defendants; All Plaintiffs Against Gerber)

83.     Plaintiffs incorporate by reference the preceding paragraphs as if they were fully set forth herein.

84.     In addition to the foregoing causes of action, each Plaintiff brings this cause of action on her own behalf under the law of the State in which she purchased Contaminated Products produced by Defendants and on behalf of:   (a) all other persons who purchased Contaminated Products produced by Defendants in the States where Plaintiffs purchased Contaminated Products; and (b) all other persons who purchased Contaminated Products in States having similar laws regarding unjust enrichment.

85.     Defendants benefited from monies received from the purchases made by Plaintiffs and members of the Class for the Contaminated Products produced by Defendants.

86.     Under the circumstances, it would be inequitable for Defendants to retain the above-described benefits.

87.     As a result of Defendants' unjust enrichment, Plaintiffs and members of the Class were injured in an amount to be determined at trial and seek full disgorgement and restitution of Defendants' unjust enrichment.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the Class pray that the Court enter judgment for them against Defendants as follows:

a.      Certifying the Class pursuant to F.R.C.P. 23, certifying Plaintiffs as the representatives of the Class, and designating Plaintiffs' counsel as counsel for the Class;

b.      Declaring that Defendants' acts and practices, as described herein, constitute unfair and deceptive acts and practices that are unlawful under the laws cited herein;

c.      Awarding Plaintiffs and the Class permanent injunctive relief prohibiting, restraining and enjoining Defendants from engaging in the conduct complained of herein, including, *inter alia*, manufacturing, promoting, marketing, advertising, selling and/or distributing the Contaminated Products in the manner described herein;

d.      Ordering Defendants to issue corrective advertising;

e.      Awarding Plaintiffs and the Class refunds, actual damages consequential damages, other special damages, attorneys' fees and other reasonable costs; and

f.      Granting any such other and further legal or equitable relief as this Court deems appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all claims so triable as a matter of right.

Dated:  July 8, 2011

Respectfully Submitted,

**SUZANNE KENNEDY, KAREN POULIS,
JASMINE BEAN-WALTON and ARLENE
PATRICK individually and on behalf of all
others similarly situated,**

By their attorneys,

/s/ Patrick J. Sheehan
Patrick J. Sheehan (BBO # 639320)
WHATLEY DRAKE & KALLAS, LLC
60 State Street, 7th Floor
Boston, MA 02109
(617) 573-5118 (ofc)
(617) 573-5090 (fax)
psheehan@wdklaw.com

Joe R. Whatley, Jr.
WHATLEY DRAKE & KALLAS, LLC
1540 Broadway, 37th Floor
New York City, New York 10036
(212) 447-7070 (ofc)
(212) 447-7077 (fax)
jwhatley@wdklaw.com

Howard W. Rubinstein
LAW OFFICES OF HOWARD RUBINSTEIN
P.O. Box 4839
Aspen, CO 81612
HowardR@pdq.net
(832) 715-2788 (ofc)

Marian S. Rosen
(Tx SBN 17263000)
MARIAN S. ROSEN & ASSOCIATES
5065 Westheimer Road, Suite 840
Houston, Texas 77056
(713) 222-6464 (ofc)
(713) 227-4703 (fax)
marian@marianrosen.com

John G. Emerson
EMERSON POYNTER LLP
830 Apollo Lane
Houston, TX 77058-2610
(281) 488-8854 (ofc)
jemerson@emersonpoynter.com

Scott E. Poynter
Christopher D. Jennings
Will T. Crowder
EMERSON POYNTER LLP
The Museum Center
500 President Clinton Ave, Suite 305
Little Rock, AR 72201
(501) 907-2555 (ofc)
scott@emersonpoynter.com

Alan Mansfield
THE CONSUMER LAW GROUP
9466 Black Mountain Rd., Suite 225
San Diego, CA 92126
(619) 308-5034 (ofc)
(888) 341-5048 (fax)

Fletcher V. Trammel
Justin C. Jenson
BAILEY PERRIN BAILEY
440 Louisiana Street, Ste. 2100
Houston, Texas 77002
(713) 425-7100 (ofc)
(713) 425-7101 (fax)
ftrammell@bpblaw.com
jjenson@bpblaw.com

Reginald Von Terrell
THE TERRELL GROUP
Post Office Box, 13315, PMB #148
Oakland, California 94661
(510) 237-9700 (ofc)
(510) 237-4616 (fax)

Robert A. Jigarjian
JIGARJIAN LAW OFFICE
128 Tunstead Avenue
San Anselmo, CA 94960
jigarjianlaw@gmail.com
(415) 341-6660 (ofc)

Brian W. Smith
SMITH & VANTURE LLP
1615 Forum Place, Suite 4C
West Palm Beach, FL 33401
bws@smithvanture.com
(561) 684-6330 (ofc)
(561) 688-0630 (fax)

William A. Levin
LEVIN SIMES KAISER GORNICK, LLP
44 Montgomery Street, 36th Floor
San Francisco, CA 94104
(415) 646-7160 (ofc)
(415) 981-1270 (fax)
wlevin@lskg-law.com

W. Craft Hughes
HUGHES ELLZEY, LLP
Galleria Tower 1
2700 Post Oak Blvd., Suite 1120
Houston, Texas  77056
(888) 350-3931 (ofc)
(713) 668-3819 (fax)

Donald Amamgbo
AMAMGBO & ASSOCIATES
6167 Bristol Parkway, #325
Culver City, California 90230
(301) 337-1134 (ofc)
(310) 337-1157 (fax)

Sydney Jay Hall
LAW OFFICES OF SYDNEY J. HALL
1308 Bayshore Highway, Suite 220
Burlingame, California 94010
(650) 342-1830 (ofc)
(650) 342-6344 (fax)

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true copy of the foregoing document, filed through the ECF system, will be served on the attached Panel Attorney Service List and all counsel of record via electronic mail on July 8, 2011.

<u>/s/ Patrick J. Sheehan</u>
Patrick J. Sheehan

## PANEL ATTORNEY SERVICE LIST

James M. Schurz
MORRISON FOERSTER LLP
425 Market Street
San Francisco, CA 94105-2182
Tel: (415) 268-7000
Fax: (415) 268-7522
jschurz@mofo.com

Counsel for Defendants Del Monte Corporation; Trader Joe's Company; Welch Foods, Inc.; The Hain Celestial Group, Inc.; The J.M. Smucker Company; Dole Food Company, Inc.; KFP International, Ltd.; Topco Associates, L.L.C.; The Coca-Cola Company; Gerber Products Company; and Mott's, LLP in cases 3:10-cv-12200-MAP, 3:11-cv-30107-MAP, 3:11-cv-30108-MAP, 3:11-cv-30112-MAP, 3:11-cv-30118-MAP and 3:11-cv-30120-MAP, as applicable.

Patrick J. Sheehan (BBO # 639320)
WHATLEY DRAKE & KALLAS, LLC
60 State Street, 7th Floor
Boston, MA 02109
Tel:  (617) 573-5118
Fax:  (617) 573-5090
psheehan@wdklaw.com

Counsel for Plaintiffs Lydia Littlefield, Suzanne Kennedy, Karen Poulis, Nicole Crawford, Jasmine Bean-Walton and Arlene Patrick in cases 3:10-cv-12200-MAP, 3:11-cv-30107-MAP, 3:11-cv-30108-MAP and 3:11-cv-30118-MAP, as applicable.

Fletcher V. Trammel
BAILEY PERRIN BAILEY
440 Louisiana Street, Ste. 2100
Houston, Texas 77002
Tel:  (713) 425-7100
Fax:  (713) 425-7101
ftrammell@bpblaw.com

Counsel for Plaintiff Jasmine Bean-Walton in case 3:11-cv-30112-MAP.

Reginald Von Terrell
THE TERRELL GROUP
Post Office Box, 13315, PMB #148
Oakland, California 94661
Tel:  (510) 237-9700
Fax:  (510) 237-4616
reggiet2@aol.com

Counsel for Plaintiff Arlene Patrick in case 3:11-cv-30120-MAP.